IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON


OREGON STATE PUBLIC INTEREST
RESEARCH GROUP, DIANE HEINTZ, and
RENA TAYLOR,

        Plaintiffs,

  v.

PACIFIC COAST SEAFOODS COMPANY,
PACIFIC SURIMI JOINT VENTURE, LLC,
PACIFIC SURIMI CO., INC., and
DULCICH, INC. d/b/a PACIFIC SEAFOOD
GROUP,

        Defendants.
_____

Civil No. 02-924-HA

OPINION
AND ORDER

Charles C. Caldart
National Environmental Law Center
3240 Eastlake Avenue, E
Suite 100
Seattle, Washington 98102

Joseph J. Mann
National Environmental Law Center
369 Broadway Street
Suite 200
San Francisco, California 94133

Karl G. Anuta
Sokol & Anuta, PC
735 S.W. First Avenue
Portland, Oregon 97204
    Attorneys for Plaintiffs

Jerry B. Hodson
Hong G. Huynh
Suzanne C. Lacampagne
Miller Nash, LLP
3400 U.S. Bancorp Tower
111 S.W. Fifth Avenue
Portland, Oregon 97204
    Attorneys for Defendants

HAGGERTY, Chief Judge:

On March 15, 2004, this court found defendants Pacific Coast Seafoods Company, Inc. (Coast), Pacific Surimi Joint Venture, LLC, and Pacific Surimi Co., Inc. (collectively referred to as Pacific Surimi) liable for several ongoing violations of the Clean Water Act (CWA or the Act) at their Warrenton, Oregon seafood processing facility (the facility). On May 20, 2005, plaintiffs filed the pending Motion for a Preliminary Injunction (Doc. #102). Plaintiffs assert that on August 5, 2004, they conducted an on-site inspection of the facility and took samples of the wastewater. Plaintiffs contend that the results reveal that organic and chemical pollutants discharged from the facility create a climate that is hostile to aquatic life and harmful to humans.

Asserting that the most significant harm to the environment occurs during the summer months, plaintiffs seek to enjoin defendants from beginning their summertime processing, set to commence June 15, 2005. Plaintiffs ask that defendants be precluded from beginning operations until they have obtained a valid National Pollutant Discharge Elimination System (NPDES) permit. Alternatively, plaintiffs request that defendants be ordered to: (1) either refrain from discharging surimi wastewater into the Skipanon River or install additional treatment technology sufficient to greatly reduce pollutant discharges; (2) install an effluent diffuser at the existing outfall pipe's terminus; (3) provide superior treatment for the conventional seafood processing wastewater; and (4) take immediate steps to locate all sources of bacteria in the wastewater, and either eliminate the sources or install appropriate treatment to reduce the bacteria discharged to the Skipanon River to acceptable levels.

Oral argument was heard on June 13, 2005. For the following reasons, the court grants plaintiffs' motion, and denies defendants' oral motion for a permanent or temporary stay.

**PERTINENT FACTS**

In its March 15, 2005 Opinion and Order, this court ruled that Pacific Surimi is liable for 332 days of violations for discharging pollutants without first obtaining a valid NPDES permit, and for 433 days of violations for exceeding effluent discharge limits for biochemical oxygen demand (BOD) and oil and grease. This court also ruled that Pacific Coast is liable for 619 days of violations for exceeding discharge limits for total suspended solids (TSS) and oil and grease.

For purposes of this preliminary injunction, this court finds the following facts to be true:

The levels of toxicity for BOD, TSS, and oil and grease increase significantly during the summer months when surimi is processed, impairing water quality and posing health risks to humans. Declaration of Charles C. Caldart in Support of Plaintiff's Motion for Preliminary Injunction (Caldart Decl.), Ex.1. On August 5, 2004, plaintiffs sampled defendants' wastewater and found high levels of BOD, TSS, and oil and grease, including significant levels of ammonia, fecal coliform bacteria, *E. coli* bacteria, enterococcus bacteria, phosphorus, nitrogen, and sulfide. Declaration of David LaLiberte in Support of Plaintiffs' Motion for Preliminary Injunction (LaLiberte Decl.), ¶ 28; Caldart Decl., ¶¶ 3, 4.

Harm to Aquatic Life

The Skipanon River is home to a variety of aquatic wildlife, such as coho salmon, chinook salmon, cutthroat troat, sculpin, longnose dace, starry flounder, and pacific lamprey. Caldart Decl., Exs. 3, 6. The coho salmon is proposed to be listed as a "threatened" species under the Endangered Species Act (ESA). 69 F3d. Reg. 33, 102, 33, 165 tbl. 3 (June 14, 2004). The chinook salmon is already listed as "threatened" under the ESA. *Id.* The Oregon Department of Fish and Wildlife has listed the pacific lamprey in the Skipanon River as "vulnerable." OAR § 635-100-0040.

Mr. LaLiberte, one of plaintiffs' expert witnesses, opined that, based in part on the extracted samples, defendants' pollutant discharges have significant adverse impacts on the water quality of the Skipanon River, and will likely kill or harm some of the river's wildlife. LaLiberte Decl., ¶ 51. When dissolved oxygen levels fall below a certain level,

they become harmful to aquatic life. The risk is paramount during the summer months when higher river temperatures, lower river flows, and increased algal activity exacerbate already low dissolved oxygen levels. *Id.* at ¶¶ 12, 14, 20, 22, 24; Declaration of Richard Ewing in Support of Plaintiffs' Motion for Preliminary Injunction (Ewing Decl.), ¶ 16. The pollutants BOD, TSS, and oil and grease are all linked to a reduction of water oxygen levels. Defendants' Answer to Plaintiffs' Amended Complaint, ¶ 29.

The Oregon Department of Environmental Quality (DEQ) has set a minimum standard for dissolved oxygen concentrations of no lower than 4.0 mg/L. OAR § 340-041-0016(2), (3), (5). Low levels of dissolved oxygen concentrations have a profoundly negative impact on a river's ability to support fish and other organisms. For example, levels lower than 4.8 mg/L stunt growth and inhibit migration. Declaration of Gary Chapman in Support of Plaintiffs' Motion for Preliminary Injunction (Chapman Decl.), ¶¶ 12-19. When the levels reach 2.3 mg/L or lower, fish die. *Id.* at ¶ 9. According to the samples taken from the facility, defendants' processing has caused dissolved oxygen levels in the Skipanon River to fall below 4.0 mg/L just beyond the edge of the 100-foot mixing zone, and below 2.0 mg/L at a distance of about 330 feet from the outfall. LaLiberte Decl., Fig. 11.

Levels of ammonia in excess of 0.4-0.8 mg/L are highly toxic to aquatic organisms, especially in the surimi effluent, and lower levels of ammonia can impair growth of hatchery salmon. Caldart Decl., Exs. 14, 15, 34, 36. Salmonids, such as coho, cutthroat trout, and steelhead treat, are particularly sensitive to ammonia, and nearly half are killed at levels of 0.40-0.9 mg/L with ninety-six hours of exposure. Ewing Decl., ¶¶5-6.

Ammonia also contributes to algal growth, which decreases the levels of ambient dissolved oxygen. LaLiberte Decl., ¶ 13.

The DEQ has established a water quality standard for ammonia at 0.0059 mg/L for water temperatures of 20 degrees Celsius and a pH of 7.0, which is the typical condition for the Skipanon River during the summer months. OAR § 340-041-0033; Ewin Decl., ¶ 7. The samples taken from defendants' wastewater indicate that the wastewater exceeds the DEQ water quality standard for ammonia at about one-half mile from the outfall. LaLiberte Decl., Figs. 3, 16.

Defendants' surimi effluent also reveals substantial levels of sulfide, a chemical that is toxic to fish. Caldart Decl., Exs. 15, 34. Low levels of hydrogen sulfide gas cause respiratory arrest in fish, while high levels are poisonous to fish. Ewing Decl., ¶¶10-12. When the levels of dissolved oxygen are adequate, dissolved oxygen breaks down hydrogen sulfide, thereby reducing its toxic effects. *Id.* at ¶ 12. However, a river's low levels of dissolved oxygen hinder this process, causing dangerous amounts of sulfides to saturate the river and suffocate the wildlife. *Id.*

<u>Harm to Human Health</u>

Water from the Skipanon River contacts people who work and recreate in and around the river. The levels of bacteria found in the sampled wastewater pose a health risk to the river's swimmers, kayakers, and boaters.

The sampled wastewater reveals significant amounts of fecal coliform, *E. coli* bacteria, and enterococcus bacteria in the surimi effluent, and to a lesser degree in the conventional seafood effluent. Caldart Decl., Exs 14, 15, 18, 34. *E. coli* and enterococcus

bacteria have been linked to gastroenteritis, a condition resulting in vomiting, diarrhea, and fever. *Id.*, Ex. 18. The DEQ considers both types of bacteria to be "pollutants of concern" because of their strong correlation to the presence of human pathogens. *Id.*.

The DEQ has a water quality standard for *E. coli* bacteria of no more than 126 organisms per 100 milliliter (ml) as a monthly log mean, and no more than 406 organisms per 100 ml in any single sample. OAR § 340-041-0009(1)(a). Caldart Decl. Ex. 18. According to the extracted samples, the facility's wastewater has approximately 1100 organisms per 100 ml at Coast's 100-foot mixing zone. LaLiberte Decl., Figs. 18, 19. The levels drop down to just over 230 organisms per 100 ml about one-half mile from the outfall.

For enterococcus bacteria, the Environmental Protection Agency (EPA) has determined that a safe level is an average of no more than thirty-three organisms per 100 ml, with no more than ten percent of samples exceeding 108 organisms per 100 ml. Caldart Decl., Ex. 18. Defendants' concentrations of enteroccocus bacteria approximate at 960 organisms per 100 ml near the mixing zone, and just under 200 organisms per 100 ml at one-half mile out. LaLiberte Decl., Fig. 20.

Other Findings

The court finds that defendants are likely to continue discharging the aforementioned pollutants into the Skipanon River in violation of the CWA. Pacific Surimi lacks a valid NPDES permit. It will continue to violate the CWA's zero-discharge requirement for every day that it discharges wastewater into the river without a valid permit. Similarly, the court finds that Coast will continue to discharge wastewater in

excess of the numeric limits in its NPDES permit and cause the violation of in-stream dissolved oxygen standards. Obtaining a permit, and remaining in compliance with that permit's numeric effluent limits, would greatly assist in eliminating the multiple violations of water quality standards and in-stream dissolved oxygen standards being committed daily by defendants. 33 U.S.C. §§ 1311(b)(1)(c); 1313(d)(4)(A); 40 C.F.R. § 122.4(d).

Defendants suggest that there is no need to order a preliminary injunction because they are taking adequate steps to remedy the harm. Together with the DEQ and the City of Warrenton, defendants have developed a public-private partnership that intends to reroute defendants' discharge to the Columbia River by March 2006. Defendants' Memorandum in Opposition to Plaintiffs' Motion for Preliminary Injunction (Defs.' Opp.), at 1.

This court finds no credible assurance that defendants will be able to discharge to the Columbia River by next spring. In September 2004, defendants argued that they would be discharging to the Columbia River by March 2005. Caldart Decl., Ex. 9. They failed to do so. Moreover, even if defendants were able to reroute their discharges by next spring, that does not affect the current irreparability analysis. *See Piney Run Pres. Ass'n v. County Comm'rs of Carroll County*, *Md.*, 82 F. Supp. 2d 464, 473 (D. Md. 2000) (finding that, despite the sewage treatment plant's efforts to mitigate environmental damages, injunctive relief was appropriate because the plant continued to violate the CWA), *vacated on other grounds*, 268 F.3d 255 (4th Cir. 2001). Obviously, the possibility that defendants may cease their unlawful discharges by next spring does not bear on whether the harm they are inflicting now is irreparable.

//

**STANDARDS**

The CWA authorizes district courts to issue appropriate injunctive relief to redress violations of the Act. 33 U.S.C. § 1319(b). This authority is limited to issuing injunctions to restrain violations or to require future compliance. *See Natural Res. Def. Council v. Southwest Marine, Inc.*, 236 F.3d 985, 999-1001 (9th Cir. 2000) (although federal courts do not have the authority to impose effluent limitations more stringent than those imposed by the EPA, injunctive measures that complement or seek to enforce permits are valid). As long as the equitable relief sought is reasonably calculated to remedy the established wrong and is roughly proportional to the violations at issue, courts are permitted wide berth in establishing appropriate remedial relief. *Id.* at 1000; *see also Weinberger v. Romero-Barcelo*, 456 U.S. 305, 320 (1982) (courts are given discretion "to order that relief it considers necessary to secure *prompt* compliance with the Act.") (emphasis provided).

"The standard for granting a preliminary injunction balances the plaintiff's likelihood of success against the relative hardship to the parties." *Clear Channel Outdoor Inc. v. City of Los Angeles*, 340 F.3d 810, 813 (9th Cir. 2003). The plaintiff must demonstrate either: "(1) a likelihood of success on the merits and the possibility of irreparable injury; or (2) that serious questions going to the merits were raised and the balance of hardships tips sharply in its favor." *Id*. "These two alternatives represent extremes of a single continuum, rather than two separate tests . . . . Thus, the greater the relative hardship to [the party seeking the preliminary injunction,] the less probability of success must be shown." *Id*. (citation and internal quotations omitted). "Serious questions" are those "questions which cannot be resolved one way or the other at the

hearing on the injunction . . . ." *Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1362 (9th Cir. 1988). Serious questions are substantial, difficult, and doubtful enough to require more considered investigation. *Id.* Such questions need not show a certainty of success, nor even demonstrate a probability of success, but rather "must involve a `fair chance of success on the merits.'" *Id.* (quoting *Nat'l Wildlife Fed'n v. Coston*, 773 F.2d 1513, 1517 (9th Cir. 1985)).

When considering the issuance of a injunction in a case in which the court will need to address the environmental impact of a proposed agency action, the court must assume that "[e]nvironmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.*, irreparable." *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987). Consequently, where a plaintiff has shown that environmental injury is sufficiently likely, "the balance of the harms will usually favor the issuance of an injunction to protect the environment." *Id.*

A preliminary injunction is designed to preserve the status quo of the parties and prevent irreparable loss. *Barahona-Gomez v. Reno*, 167 F.3d 1228, 1234 (9th Cir. 1999). However, "[i]f the currently existing status quo itself is causing one of the parties irreparable injury, it is necessary to alter the situation so as to prevent the injury." *Canal Auth. of the State of Florida v. Callaway*, 489 F.2d 567, 576 (5th Cir. 1974). Thus, "[t]he focus always must be on prevention of injury by a proper order, not merely on preservation of the status quo." *Id.*

In addition to showing irreparable injury, the party moving for a preliminary injunction must show that there exists no adequate remedy at law. "Environmental injury,

by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e., irreparable." *Sierra Club v. U.S. Forest Serv.*, 843 F.2d 1190, 1195 (9th Cir. 1988) (quoting *Amoco*, 480 U.S. at 544-47). Therefore, when the moving party is able to show that environmental injury is "sufficiently likely . . . the balance of harms will usually favor the issuance of an injunction to protect the environment." *Amoco*, 480 U.S. at 545.

## **DISCUSSION**

Plaintiffs argue that defendants' continued discharge and violations will cause irreparable harm to the Skipanon River wildlife. This harm is enhanced by the impending summer processing season, which plaintiffs argue will have a damaging rippling effect on this ecosystem for years. Chapman Decl., ¶ 24 (noting that the EPA estimates that it takes approximately three years for river systems to recover from persistent discharge of toxic pollutants). Proof of ongoing violations of applicable federal and local discharge standards is sufficient to find irreparable injury. *Int'l Union, United Auto., Aerospace, and Agric. Implement Workers of Am., AFL-CIO v. Amerace Corp.*, 740 F. Supp. 1072, 1086-87 (D.N.J. 1990) (continued violations of pollutant discharge standards, especially persisting after the filing of a civil complaint, is sufficient to establish a likelihood of irreparable harm).

Plaintiffs filed their complaint in 2002. The samples at issue here were taken in August 2004. In March 2005, the court found defendants liable for hundreds of violations. The court finds that plaintiffs have sufficiently shown irreparable harm.

Turning to the second prong, plaintiffs have demonstrated likely success on the merits. In the court's March 15, 2005, Opinion and Order, the court found Pacific Surimi liable for discharging pollutants without an NPDES permit and for violating the terms of a state enforcement order. It also found Pacific Coast liable for ongoing violations of its NPDES permit. Because Surimi has still not obtained a valid NPDES permit and continues to discharge, and because there is a strong likelihood that Coast will not be in compliance of its NPDES permit at the time of trial, plaintiffs are likely to succeed on the merits.

The balance of hardships also favors the issuance of an injunction. Where the violations are willful, which the court finds is the case here, the court need not engage in the equitable balancing analysis. *See United States v. Marine Shale Processors*, 81 F.3d 1329, 1358-59 (5th Cir. 1996) (declining to balance harms when the defendant had willfully violated federal environmental statues); *see also United States v. Bethlehem Steel Corp.*, 38 F.3d 862, 867-69 (7th Cir. 1995); *United State v. Pozsgai*, 999 F.2d 719, 736 (3d Cir. 1993). Additionally, courts are not required to balance the equities when the moving party is a government agency or a citizen standing in its place, such as the case of CWA plaintiff-citizen suits, or where the activity to be enjoined may endanger public health. *Bethlehem Steel*, 38 F.3d at 868.

Applying equitable principles, the balance clearly weighs in favor of plaintiffs because the harm to the environment and to the public outweigh financial interests defendants may have. *See League of Wilderness Defenders v. Forsgren,* 184 F. Supp. 2d 1058, 1070-71 (D. Or. 2002) (economic injury to the defendant deserves less weight when

balanced against environmental harm); *see also Arkansas Wildlife Fed'n v. Bekaert Corp.*, 791 F. Supp. 769, 784 (W.D. Ark. 1992).

      Defendants have squandered opportunities during the course of these proceedings to comply with the Act absent the issuance of a preliminary injunction. Defendants' continuing violations and failures to comply with the law renders this preliminary injunction necessary. In determining the parameters of the injunction, the court has considered the parties' proposals, the ongoing and threatened harms, and the interests of the parties. This court concludes that to prevent or lessen irreparable loss, defendants must be enjoined as follows: Coast and Surimi are ordered to cease all surimi processing until such time as they are able to discharge to the Columbia River, but they are permitted to continue operations of conventional seafood processing without any form of additional restrictions.

//
//
//
//
//
//
//
//
//
//

//

**CONCLUSION**

Plaintiffs' Motion for a Preliminary Injunction (Doc. #102) is GRANTED. Defendants are enjoined as follows: Coast and Surimi are ordered to cease all surimi processing until such time as they are able to discharge to the Columbia River. Coast and Surimi are allowed to continue operations of conventional seafood processing without any form of additional restrictions.

The bond in this public interest litigation is waived. *See People ex rel Van de Kamp v. Tahoe Regional Plan*, 766 F.2d 1319, 1325-26 (9th Cir. 1985) (court has discretion to dispense with the security requirement where requiring security would effectively deny access to judicial review for a non-profit environmental group).

Counsel for plaintiffs shall submit a proposed Order of Injunction after consulting with the opposing parties and determining whether scheduling for briefing and a hearing for issuance of a permanent injunction is necessary. If scheduling is necessary, the draft Order shall provide a proposed schedule. This Order shall be submitted to the court within ten days of the date of this Opinion and Order.

IT IS SO ORDERED.

DATED this _14____ day of June, 2005.

      _____/s/Ancer L.Haggerty_____
               ANCER L. HAGGERTY
              United States District Judge